IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **EVANSTON INSURANCE COMPANY,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. **3:05-CV-2068-L** |
| | § | |
| **MATT ADKINS, INDIVIDUALLY AND** | § | |
| **D/B/A CIRCLE 4M WELDING AND** | § | |
| **FABRICATION**, and **TEXAS** | § | |
| **INDUSTRIES, INC.**, and | § | |
| **TXI OPERATIONS, L.P.**, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are two motions for summary judgement: Plaintiff's Motion for Summary Judgment, filed by Evanston Insurance Company ("Evanston") on December 13, 2005; and Defendants/Counter-Plaintiffs Texas Industries, Inc. and TXI Operations, L.P.'s Motion for Summary Judgment, filed by the named Defendants (collectively, "TXI") on March 30, 2006. After careful consideration of the motions, briefs in support, responses, replies, summary judgment evidence, record and applicable law, the court **denies** Plaintiff's Motion for Summary Judgment. The court also **denies in part and grants in part** Defendants/Counter-Plaintiffs Texas Industries, Inc. and TXI Operations, L.P.'s Motion for Summary Judgment.

### I.  BACKGROUND

This is an insurance coverage dispute.  Plaintiff Evanston issued a commercial general liability policy (number CL 421100513) to Defendant Matt Adkins, doing business as Circle 4M Welding and Fabrication ("Adkins").  Defendants TXI own and operate The Midlothian Cement

**Memorandum Opinion and Order – Page 1**

Plant in Midlothian, Texas.  TXI hired Adkins as an independent contractor for welding services at the cement plant.  TXI has sued Adkins in state district court for allegedly causing a fire at the cement plant on January 7, 2003.[1]  Adkins subsequently filed for bankruptcy protection.  The bankruptcy court lifted the automatic stay protections so that TXI may attempt to recover for its state court claims from Adkins's insurance company, Evanston.  Evanston then filed this action seeking a declaratory judgment that its policy does not cover Adkins's liabilities for the fire, and, therefore, it has no duty to defend or to indemnify Adkins in any judgment that may issue from the state claims.  TXI filed a counter-claim in this court seeking a declaratory judgment that would obligate Evanston to defend Adkins in the state lawsuit.[2]  Both parties then filed motions for summary judgment.

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standard

**1.  Summary Judgment**

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[1]TXI filed suit against Adkins on June 17, 2005, in the 40th Judicial District Court of Texas in Ellis County, cause number 69077.  Separately, TXI's insurance company, Factory Mutual Insurance Company, also filed suit against Adkins in the 40th Judicial District Court of Texas, cause number 69210.  The two suits were consolidated; thus, this court will refer to the state court claims as one lawsuit.

[2]TXI objects to Evanston's failure to join TXI's insurance company, Factory Mutual, as a "necessary party" to this action, because Factory Mutual's separate state lawsuit against Adkins over the same fire was consolidated with TXI's action.  Factory Mutual may have the same interest as TXI in declaring Evanston obligated to defend Adkins; however, Factory does not qualify as a "necessary party  since complete relief without any inconsistencies may be granted in this case without its presence.  *See* Fed. R. Civ. P. 19(a).  Further, if Factory believes that it should protect its interests in this case, it may seek intervention pursuant to Federal Rules of Civil Procedure 24.

of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forth with competent summary judgment evidence of the existence of a genuine fact issue.  *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate to the precise manner in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nomovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S.

832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing

laws will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  Disputed

issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a

summary judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to

establish the existence of an element essential to its case and on which it will bear the burden of

proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## 2.  Duty to Defend

TXI seeks a declaration of coverage for the underlying state court claims.  Evanston asserts

that TXI's underlying lawsuit only alleges economic damages not covered by the policy or,

alternatively, that four exclusions in the policy apply to exclude coverage.  In determining whether

an insurer has a duty to defend, the court must examine the pleading upon which the insurer based

its refusal to defend the action.  *See Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d

695, 701 (5th Cir. 1996).  Texas courts follow the "eight corners" rule, which requires the trier of fact

to examine only the allegations in the underlying complaint and the insurance policy, *see id.*; *see

also Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th

Cir. 1993), without reference to their veracity.  *See Argonaut Southwest Ins. Co. v. Maupin*, 500

S.W.2d 633, 635 (Tex. 1973).

In reviewing the underlying pleadings, the court must focus on the factual allegations that

show the origin of the damages rather than on the legal theories alleged.  *Am. States Ins. Co. v.

Bailey*, 133 F.3d 363, 369 (5th Cir. 1998); *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines,

Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (citing *Adamo v. State Farm Lloyds Co.*, 853 S.W.2d 673,

676 (Tex. App.–Houston [14th Dist.] 1993, writ denied) ("It is not the cause of action alleged which

**Memorandum Opinion and Order – Page 4**

determines the coverage but the facts giving rise to the alleged actionable conduct.")).   The

allegations in the underlying petition are to be interpreted liberally, resolving any doubt in favor of

the insured.  *National Union*, 939 S.W.2d at 141.  The duty to defend arises when the facts alleged

in the petition, if taken as true, potentially state a cause of action within the terms of the policy.

*Canutillo*, 99 F.3d at 701.  Thus, it is the insured's burden to show that the claim against it is

potentially within the policy's coverage.[3]  *Id.*  An insurer has an obligation to defend an insured if

the petition alleges at least one cause of action within the policy's coverage.  *Id.*  If, however, under

the facts alleged, there is a *prima facie* showing that the claim is not covered under the policy, the

insurer has no duty to defend.  *See National Union*, 939 S.W.2d at 141.

Ἰ       The interpretation of an insurance policy is a question of law.  *New York Life Ins. Co. v.*

*Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996).  Insurance policies are contracts and are

governed by the principles of interpretation applicable to contracts.  *Amica Mut. Ins. Co. v. Moak*,

55 F.3d 1093, 1095 (5th Cir. 1995) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex.

1987)).  As this is a diversity case, Texas rules of contract interpretation control.  *See id.*; *see also*

*Potomac Ins. Co. v. Jayhawk Medical Acceptance Corp.*, 198 F.3d 548, 550 (5th Cir. 2000).

        Unlike the duty to defend, which is based on the allegations in the petition, the duty to

indemnify is triggered by the actual facts establishing liability in the underlying suit.  *See Trinity*

*Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997).  If there is no duty to defend, there

is no duty to indemnify.  *See Bailey*, 133 F.3d at 368.  Thus, the court must first determine whether

---

[3]Adkins has filed only one document in this action, a three-sentence answer that may be characterized as a general denial of liability, citing to his bankruptcy petition.  TXI, as a named defendant in this litigation, and as a counter-claimant, bears the same burden that Adkins has to show that its state claims fall within the policy's coverage.  *See*, *e.g.*, *Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 311 (N.D. Tex. 2004); *Nat'l Am. Ins. Co. v. Breaux*, 368 F.Supp.2d 604, 620-21 (E.D. Tex. 2005).

**Memorandum Opinion and Order – Page 5**

TXI's pleadings in the underlying lawsuit potentially state claims covered by the Adkins policy and, if so, whether any of the four provisions raised by Evanston exclude coverage.

## B.  Analysis

Under the "eight corners" rule, this court must use specific language from the underlying lawsuit and the insurance policy to evaluate Evanston's duty to defend Adkins.  Before the court analyzes the specific language, however, it will first paraphrase and summarize the relevant facts and contentions.  TXI hired Adkins to do welding work on a "scrubber tank," a ninety-foot high structure, forty feet across in diameter.  The scrubber "filtered exhaust gases from the pre-heater dust collectors" at Kiln No. 5 at the cement plant.  Adkins was to replace an expansion joint at the scrubber's outlet and exhaust air duct.  This required Adkins and his four-man crew to first remove flanges around the joint by welding.  Inside the scrubber tank, about two feet below the outlet duct that required welding, sat two levels of "polypropylene mist eliminators" (also referred to as "demisters").  Around 10:30 p.m. on January 7, 2003, molten metal particles from the welding came into contact with the polypropylene demisters and caused a fire inside the scrubber.  Adkins extinguished this fire and had his crew return to work without notifying TXI.  Moments later, Adkins's crew noticed black smoke from inside the scrubber.  A second fire then erupted and ultimately damaged Kiln No. 5.  TXI's investigation showed that, most likely, the first fire caused by the welding sparks hitting the demisters led the demisters to emit gases that ultimately erupted into the second fire.

Evanston asserts it has no duty to defend Adkins in this matter on four grounds.  First, Evanston asserts that TXI's underlying lawsuit does not state a claim covered by the terms of Adkins's insurance policy because it seeks economic damages, not property damages.  If TXI has

suffered "property damage" that would be covered by the policy, Evanston argues in the alternative that three exclusions apply to defeat coverage. The absolute pollutant exclusion bars coverage for damages stemming from a release of "pollutants." In this case, Evanston contends that the molten metal particles from the welding and the gases emitted from the polypropylene demisters are pollutants. Evanston asserts that the welder's endorsement also applies the policy's definition of "pollutant" to bar coverage for liabilities arising out of welding in or around areas containing pollutants. Finally, Evanston argues that exclusions j(5) and (6) preclude coverage for real property damage where Adkins was working or any property damage caused by his incorrectly performed work. TXI argues that each of these grounds fails, and thus it is entitled to a declaration that Evanston has a duty to defend Adkins.

## 1. Covered Claims

Evanston's first theory for denying its duty to defend is based on the lack of "property damage" in TXI's underlying claims.[4]  Evanston's Motion at 11; Evanston's Response at 5. As Evanston points out, TXI's underlying lawsuit states: "TXI has suffered *economic damages* in the form of a gross business interruption loss of $3,916,905.00, for which TXI is now suing."  TXI's State Petition" at 9 (emphasis added). Evanston asserts that "business interruption" losses are not

---

[4]Since both parties have filed motions for summary judgment, supporting briefs, appendices, responses and replies, the court will cite to each filing as follows: (1) Brief in Support of Plaintiff's Motion for Summary Judgment ("Evanston's Motion"); (2) Brief in Support of Defendants Texas Industries, Inc. and TXI Operations, L.P.'s Response to Plaintiff's Motion for Summary Judgment ("TXI's Response"); (3) Plaintiff's Reply to the Response of Defendants Texas Industries, Inc. and TXI Operations, L.P. to Plaintiff's Motion for Summary Judgment ("Evanston's Reply"); (4) Brief in Support of Defendants/Counter-Plaintiffs Texas Industries, Inc. and TXI Operations, L.P.'s  Motion for Summary Judgment ("TXI's Motion"); (5) Brief in Support of Evanston Insurance Company's Opposition to Defendant's Motion for Summary Judgment" ("Evanston's Response"); (6) Defendants/Counter-Plaintiffs Texas Industries, Inc. and TXI Operations, L.P.'s Reply Brief in Support of Their Motion for Summary Judgment ("TXI's Reply"); (7) TXI's Second Amended Original Petition filed in State District Court ("TXI's State Petition"); (8) Evanston Insurance Company Policy No. CL 421100513 ("Evanston Policy").

property damages, but rather economic losses not covered by Adkins's general liability policy. *Id.*

Evanston's policy defines "property damage" as

> (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Evanston Policy at 13. While TXI did use the term "economic damages," in reviewing the underlying pleadings, this court must focus on the factual allegations that show the origin of the damages, rather than on the legal theories alleged. *See Bailey*, 133 F.3d at 369. TXI's State Petition accuses Adkins of negligently causing a fire that "resulted in physical damage to Kiln No. 5 at the Plant," where "production of clinker (necessary to manufacture cement) was lost" for twenty-seven days. TXI's State Petition at 5. On its face, the petition alleges *physical* damage to TXI property and a loss of use of that property for twenty-seven days. TXI may, indeed, have included unrecoverable "economic" losses in its calculation of damages totaling $3,916,905. This court, however, must apply the "eight corners" rule liberally in favor of the insured and resolve any doubt in favor of the insured. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004). "If *any* allegation in the complaint is *even potentially* covered by the policy then the insurer has a duty to defend its insured." *Id.* (citing *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1492 (5th Cir. 1992)) (emphasis added by *Primrose* court). Therefore, Evanston's summary judgment motion on the ground that TXI failed to state a covered claim is **denied**, to the extent that any portion of TXI's total claim for damages includes physical damage to property covered by the Evanston Policy.

**Memorandum Opinion and Order – Page 8**

## 2.  Absolute Pollutant Exclusion

Evanston argues in the alternative that, even if TXI's claim includes property damage, the policy's absolute pollutant exclusion bars coverage in this case.   Evanston's Response at 6. Specifically, the absolute pollution exclusion bars coverage for:

> [a]ny loss, cost, expense . . . arising out of . . . (2) any litigation or administrative procedure in which any insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

Evanston Policy at "Combination General Endorsement" 4(B).   The policy defines pollutants as "any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste.  Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed."  *Id.*  Evanston contends that the  molten metal particles produced during Adkins's work, called "welding slag," fall within the definition of a pollutant, since "it is a solid irritant, contaminant or waste."[5]  Evanston's Motion at 9.  Additionally, Evanston contends the gases emitted from the demisters as a result of contact with the welding slag are pollutants under the policy.  *Id.*  Accordingly, the court must first determine whether either substance falls within the policy's definition of "pollutant" before it can determine whether the absolute pollutant exclusion applies.

---

[5]The court quotes from Evanston's Motion, but disagrees with its contention that welding slag falls within the policy's definition of a pollutant merely because "it is a solid irritant, contaminant or *waste*."  The policy defines pollutants as any "solid . . . irritant or contaminant, including but not limited to . . . waste."  The adjective "solid" modifies the nouns "irritant or contaminant," but not the noun "waste."  The court points out that, by Evanston's own definition, "waste" is merely an example of a possible "irritant or contaminant."

**Memorandum Opinion and Order – Page 9**

Evanston's broad definition for pollutant is similar to those found in other pollution exclusion clauses that have posed problems for other courts determining the scope of these exclusions. *See*, *e.g.*, *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.*, 112 F.3d 184 (5th Cir. 1997); *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037 (7th Cir. 1992); *Richardson v. Nationwide Mutual Ins. Co.*, 826 A.2d 310 (D.C. App. 2003) (vacated pursuant to settlement); *Meridian Mutual Ins. Co. v. Kellman*, 197 F.3d 1178 (6th cir. 1999); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999). As some of these courts have pointed out:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property. Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.

*Certain*, 112 F.3d at 188 (quoting, in part, *Pipefitters*, 976 F.2d at 1043). For example, the Seventh Circuit in *Pipefitters* suggested it would be absurd to apply the pollution exclusion in common accidents, such as a slip-and-fall caused by a spilled bottle of Drano, or an allergic reaction to chlorine in a swimming pool, merely because both Drano and chlorine are chemicals that may irritate or contaminate. *Pipefitters*, 976 F.2d at 1043.

Indeed, many courts have applied the "common-sense approach" advocated by the Seventh Circuit in *Pipefitters* and the Fifth Circuit in *Certain* when interpreting the scope of pollutant exclusions. Courts have refused to apply the exclusion for liabilities arising from such accidents as carbon monoxide poisoning at an Indian restaurant caused by a lack of air going to the chicken-roasting clay oven;[6] toxic fumes from carpet glue that caused building occupants to become sick;[7]

---

[6] *Western Alliance Ins. Co. v. Gill*, 686 N.E.2d. 997 (Mass. 1997).

[7] *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37 (Ind. 2002).

**Memorandum Opinion and Order – Page 10**

paint damage to vehicles during spray painting of a bridge;[8] illness from poor ventilation and high

levels of exhaled carbon dioxide at an office building.[9]  In contrast, the Seventh Circuit ultimately

applied the pollution exclusion in *Pipefitters* for damages arising from the discharge of

polychlorinated biphenyls (PCBs) from an electrical transformer that the underlying defendant sold

to the underlying plaintiff scrap metal dealer.  *Pipefitters*, 976 F.2d at 1044.  The court held that no

matter how far the limiting principle extends, common sense would characterize the discharge of

eighty gallons of PCB-laden oil as pollution that would not typically ensue from the process of scrap

metal.  *Id.*  The Fifth Fircuit, which agreed with the Seventh Circuit's common-sense approach, also

applied the pollution exclusion in its case.  *Certain*, 112 F.3d at 188-89.  In *Certain*, a welder

working at a chemical plant in Texas suffered injuries when heat from the hot pipe he had just

welded came into contact with the chemical stored inside the pipe to form a cloud of harmful phenol

gas.  *Id.* at 185.  The Fifth circuit held that the "substantial nature" of the discharge distinguished

the phenol gas cloud from the Seventh Circuit's spilled Drano example.  *Id.*

    While none but the *Certain* decision from the above cases binds this court, a survey of these

decisions reveals some similarities in rationale this court finds persuasive.  These cases also provide

the basis for a three-step approach to analyzing pollutant claims.  First, the court should determine

whether the substance at issue falls within the insurance policy's *literal* definition of pollutant.  If

it does not, then no pollutant exclusion would apply, and no analysis is necessary.  If, however, the

substance falls within the policy's literal definition of pollutant, then the court must next determine

whether it *caused* the damages in the underlying insurance claim.  *See Certain* 112 F.3d at 188;

*Pipefitters*, 976 F.2d at 1044.  In *Certain*, the chemical stored inside the pipe where the welder

---

[8]*A-1 Sandblasting & Steamcleaning Co., Inc. v. Baiden*, 643 P.2d 1260 (Ore. 1982).

[9]*Donaldson v. Urban Land Interests, Inc.*, 564 N.W.2d 728 (Wis. 1997).

**Memorandum Opinion and Order – Page 11**

worked was not the "pollutant" that caused the injuries; rather, it was the cloud of phenol fumes that formed when the hot, newly welded pipe came into contact with the chemical that qualified as the "pollutant" triggering the exclusion. *Certain* 112 F.3d at 188. Likewise, in *Pipefitters*, the scrap metal salvaged by the underlying plaintiff would have fit the literal definition of a waste pollutant, but it was the seepage of PBCs from inside the scrap transformer that *caused* the plaintiff's damages and triggered the pollutant exclusion. In this case, language from Evanston's policy itself makes causation a necessary element for triggering the pollutant exclusion. The clause excludes coverage for expenses "*arising out of*" or "*as a result of*" the "discharge, dispersal, seepage, migration, release, escape or placement of pollutants." Evanston Policy at "Combination General Endorsement" 4(B). If the substance did not *cause* the damages in the underlying claim, then no pollutant exclusion applies, despite the substance meeting the literal definition of pollutant.

If the substance at issue falls within the literal definition of pollutant, *and* it caused the damages in the underlying claim, the court should make a third inquiry: whether common sense and the "reasonable, objective expectations of the insured" at the time of contracting make it reasonable to trigger the pollutant exclusion. *See, e.g.*, *Western Alliance*, 686 N.E.2d at 1000 (unreasonable to hold that carbon monoxide, which is naturally produced during cooking in an Indian Tandoori clay oven, triggered pollutant exclusion for insured Indian restaurant); *Donaldson*, 564 N.W.2d at 732 (unreasonable to hold that carbon dioxide build-up caused by "an activity as fundamental as human respiration" and poor ventilation triggered pollutant exclusion). As the court in Donaldson noted, "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter." *Donaldson*, 564 N.W.2d at 732. If, as in *Western Alliance* and *Donaldson*, the court finds it unreasonable to apply the pollutant

**Memorandum Opinion and Order – Page 12**

exclusion, then no exclusion is triggered, despite the substance meeting the policy's literal definition of pollutant and causing the damages in the underlying complaint.  Having laid out this three-step approach for analysis, this court will apply the approach to both the welding slag and the demister gases to determine if either triggers the pollutant exclusion in Evanston's policy.

### a. Welding slag

Evanston asserts that welding slag, the molten metal particles ejected in the process of welding, is a pollutant because it is a "solid or thermal irritant or contaminant."  Taken literally, welding slag appears to fall within the policy's definition of pollutant; therefore, the court must next determine whether the substance *caused* the damages in the underlying suit.  TXI's State Petition identifies "molten metal particles" from the welding coming into contact with the polypropylene demisters as the "most probable" cause of the first fire, which then "caused the mist eliminator(s) to catch fire and emit gases ultimately erupting in the subsequent fire."  TXI's State Petition at 4 (emphasis added).  Since the welding slag may have caused the damages in the underlying suit, the court turns to the final inquiry:  whether common sense and the insured's reasonable, objective expectations at the time of contracting make it reasonable to trigger the pollutant exclusion.  The answer to this final question is, unequivocally, "no."

Because interpretation of insurance contracts in Texas follows the same rules as interpretation of other contracts, this court must give effect to the written expression of the parties' intent.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).  The contract or insurance policy must be considered as a whole, and the court must read all parts of the policy together to ascertain the agreement of the parties.  *See id.*  Applying such rules of construction, this court refuses to find that under the circumstances in this case welding slag, which is present whenever one

welds, or the molten metal particles produced during welding, qualifies as a "pollutant" under this policy, since such an interpretation would lead to clearly absurd results.  Evanston issued a commercial general liability policy to Adkins, a welder.  It would defy common sense and all reasonable expectations to interpret a welder's general liability insurance policy as negated by its pollutant exclusion any time welding slag causes damages or injury.  Such an interpretation would reduce the contractual promise of coverage to a dead letter.  Accordingly, this court finds that even though welding slag falls within the policy's literal definition of a pollutant, and even though the slag is the alleged cause of the damages in the underlying suit, the pollutant exclusion does not apply to bar coverage based on the presence of welding slag.

### b. Gases emitted from polypropylene demisters

Evanston also asserts that the "gases emitted from the demisters as a result of contact with the welding slag" are pollutants.  Evanston's Motion at 9.  These "gases" are not identified by any pleading, brief or other evidence currently before this court and are referred to only once in  TXI's State Petition.  Specifically, the state petition identifies molten metal particles from the welding coming into contact with the polypropylene demisters as the "most probable" cause of the first fire, which then "caused the mist eliminator(s) to catch fire and emit *gases* ultimately erupting in the subsequent fire."  TXI's State Petition at 4 (emphasis added).  The substances emitted from the demisters *might* fall within the policy's broad definition of a pollutant as a "gaseous . . . irritant or contaminant," because they were "gases."  The word "gaseous," however, simply modifies the nouns "irritant or contaminant," which are not defined in the policy.  This court takes judicial notice, pursuant to Federal Rules of Evidence 201, that polypropylene is a type of plastic;[10] however, the

---

[10]A dictionary definition of polypropylene is:  "any of various thermoplastic plastics or fibers that are polymers of propylene."  Merriam-Webster's Collegiate Dictionary 963 (11th ed. 2004).

**Memorandum Opinion and Order – Page 14**

court lacks sufficient information to make a factual determination of whether the "gases" emitted from the polypropylene demisters are "irritants or contaminants," such that would place the gasses within the policy's pollutant definition. Gases naturally exist in all environments where human beings are found, including the oxygen we breath in and the carbon dioxide we exhale. Since "gaseous" modifies "irritant or contaminant," Evanston must show how the unidentified "gases" emitted from the polypropylene demisters would either irritate or contaminate so as to put them within the policy's literal definition of a pollutant.

Furthermore, even if the gases could literally fall within the policy's pollutant definition, they do not trigger the pollutant exclusion because they did not *cause* the damages in the underlying suit. TXI's state petition identifies "molten metal particles" from the welding coming into contact with the polypropylene demisters as the "most probable" cause of the *first* fire, which then "*caused* the mist eliminator(s) to catch fire and emit gases ultimately erupting in the *subsequent* fire." TXI's State Petition at 4 (emphasis added). It is possible to interpret from this statement that the fire and resulting damages "arise out of" or are a "result of" the "discharge, dispersal, seepage, migration, release, escape or placement of pollutants." The pleadings, however, also place the cause of the fire and ensuing damages on the negligent welding, setting off a chain reaction leading to both fires. Since the allegations in the underlying petition must be interpreted liberally, resolving any doubt in favor of the insured, this court will accept TXI's summary judgment argument that the "gases" did not *cause* the fire, but rather that Adkins's negligent welding, coming into contact with the demisters, caused TXI's damages. *See National Union*, 939 S.W.2d at 141. Accordingly, the court denies Evanston's summary judgment motion on the ground that either the welding slag or the demister gases triggered its pollutant exclusion.

**Memorandum Opinion and Order – Page 15**

### 3. Welder's Endorsement

If either the welding slag or the demister gases qualifies as a "pollutant" under the policy, Evanston contends the welder's endorsement also bars coverage.  Evanston's Motion at 9.  The welder's endorsement excludes liability arising from welding under certain conditions, including "[a]ny welding in or around areas containing explosives or pollutants."  Evanston Policy at "Welders Endorsement" (3).  The court agrees that a substance satisfying the policy's "pollutant" definition from the absolute pollutant exclusion would also apply to the welder's endorsement.  For the same reasons that the court determined that welding slag does not trigger the policy's pollutant exclusion, even if it could be defined as a "pollutant," welding slag also will not trigger the welder's endorsement.  *See infra* at 13.  If the court accepts Evanston's assertion that welding slag, created during the normal course of welding, is a pollutant because it is a "solid or thermal irritant or contaminant," then all welding done by Adkins would take place "around areas containing . . . pollutants," and no welding accidents would ever be covered by this general liability policy issued to a welder.  This interpretation produces an unreasonable and absurd result when considering all parts of the policy together as a whole.

While welding slag does not qualify as a "pollutant" under the terms of this policy and the applicable law, this court lacks factual information to determine whether the gases emitted from the demisters qualify as pollutants within the terms of the policy.  If the unidentified gases are in fact irritants or contaminants within the policy's pollutant definition, then the welder's endorsement may bar coverage.  The court sees no inconsistency in finding, on the one hand, that the demister gases do not trigger the pollutant exclusion, even if they are determined to be "pollutants," while holding, on the other hand, that the demister gases, if determined to be "pollutants," would trigger the

**Memorandum Opinion and Order – Page 16**

welder's endorsement.  The two exclusions operate independently and merely share a definition of "pollutant."  Under the pollutant exclusion, even when a substance meeting the policy's literal definition of pollutant exists, no exclusion is triggered unless that substance *caused* the damages claimed, and common sense would not make it unreasonable to define the substance as a "pollutant" within the meaning of the policy.  Under the welder's endorsement, welding under certain risky circumstances, including areas near pollutants, would eliminate coverage.  It is irrelevant under the welder's endorsement whether the substance at issue caused the damages; however, common sense and the insured's reasonable, objective expectations at the time of contracting should not make it unreasonable to define the substance a "pollutant" within the meaning of the policy under this provision.

To summarize, if the demister gases are deemed "pollutants," it appears to the court that the welder's endorsement was designed to deny coverage for precisely the type of negligent conduct that forms the basis of TXI's suit against Adkins.  TXI has basically alleged that after Adkins's welding caused the first fire, "his alleged failure to [put out that fire], coupled with a choice to go back to work, caused the ensuing fire."  TXI's Response at 8.  TXI also explains that no gas emitted from the demisters until *after* the first fire.  TXI's State Petition at 4; TXI's Reply at 5.  Thus, if the gases that emitted between the first and second fire are determined to be "pollutants," then Adkins's "choice to go back to work" in an area with pollutants would trigger the welder's endorsement, excluding coverage for damages caused by the second fire.  Again, this court lacks the factual information necessary to determine whether the gases emitted by the demisters should fall within the meaning of "pollutant" under this policy.

**4.  "Business Risk" Exclusions Under j(5), (6)**

**Memorandum Opinion and Order – Page 17**

Evanston's final contention for denying coverage stems from exclusions labeled j(5) and j(6), which deny coverage for damage to:

> (5) That particular part of *real* property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or
> (6) That particular part of *any* property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it.

Evanston Policy at 4 (emphasis added). "Your work," is defined as "work or operations performed by you or on your behalf," and "materials, parts or equipment furnished in connection with such work or operations." Evanston Policy at 13. These types of provisions are commonly referred to as "business risk" exclusions because they generally deny coverage for the insured's defective work. *See*, *e.g.*, *Taylor v. Travelers Ins. Co.*, 40 F.3d 79, 82 (5th Cir. 1994).

Evanston contends that j(5) excludes coverage for the property damage TXI claims in this case, because TXI's petition indicates the damages arise out of Adkins's operations. *See* Evanston's Motion at 10. Since j(5) and (6) distinguish between "real" property and "any" property, this court finds that j(5) bars coverage only for *real* property damage claims made by TXI. TXI's State Petition does not allocate its total claim for $3,916,905 between real or other property damages. *See* TXI's State Petition at 9. To the extent that TXI's lawsuit seeks damages for non-real property damages, j(5) would not bar coverage.

Evanston also contends that j(6) excludes coverage for *any* of TXI's property damage claims because TXI has alleged that Adkins performed his work incorrectly, resulting in the fire. Evanston's Motion at 10. TXI makes two allegations against Adkins in its state petition, one for negligence, and another for breach of warranty. On the negligence claim, TXI alleges that Adkins should have used a different type of welding equipment that would not have thrown sparks as far;

**Memorandum Opinion and Order – Page 18**

that Adkins failed to ensure a safe working environment (in part by failing to put out the first fire or to notify TXI of that fire); that Adkins's failure to use ordinary care in both performing the work and in supervising his crew all proximately caused the fire.  TXI's State Petition at 6.  On the breach of warranty claim, TXI alleges that Adkins failed to perform his services "in a good and workmanlike manner." *Id.*  These are distinct and different claims.  One alleges negligence, causing a fire.  The other alleges poor quality of work performed by Adkins.  As noted above, exclusions like j(6) are commonly referred to as "business risk" exclusions because they deny coverage for the insured's defective work.  In this case, Evanston's j(6) provision specifically denies coverage for any property that must be "restored, repaired or replaced" due to Adkins's defective work.  TXI's breach of warranty claim against Adkins is one for defective work.  Therefore, the policy would not cover any damages TXI contends it incurred in order to restore, repair or replace the expansion joint that Adkins was in the process of removing when the fire occurred.  Since this court must interpret TXI's pleading liberally, resolving any doubt in its favor, it appears that TXI's total claim for $3,916,905 includes damages beyond the cost of restoring, repairing or replacing the expansion joint.  To the extent that TXI claims damages for property (other than real property) destroyed by Adkins's negligence, rather than his inadequate welding, neither j(5) nor j(6) bars coverage for those damages. Evanston's summary judgment motion on these grounds will be **denied** in accordance with these conclusions.

### III.  TXI'S MOTION FOR SUMMARY JUDGMENT

Defendants/Counter-Plaintiffs TXI have also filed a summary judgment motion in this case. TXI's Motion incorporates the arguments from its Response to Evanston's Motion (and Brief in Support thereof), and requests this court to consider the two motions as "cross-motions for summary judgment." TXI's Motion at 3.  In essence, TXI advances no independent grounds for judgment as a matter of law in its favor.  Rather, TXI asserts that, because none of Evanston's arguments denying coverage is valid, Evanston must defend Adkins in the state lawsuit, entitling TXI to judgment as a matter of law in this action.  *See* TXI's Motion at 2.  In particular, TXI contends that (1) it has stated a claim for property damages, beyond pure economic loss, covered by the Evanston policy; that (2) coverage may not be denied on the grounds that either the welding slag or the demister gases are pollutants that trigger exclusions because they are not pollutants; and (3) that the "business risk" j(5) and (6) exclusions do not bar coverage because TXI has claimed damages beyond the defective work performed by Adkins.  *See generally*, TXI's Response; TXI's Motion.  This court, having addressed each of these arguments in turn while addressing Evanston's Motion, concludes: (1) TXI's state claims, to the extent those claims include property damage covered by the policy, are not excluded from coverage, and, therefore, **grants** TXI's Motion on this ground; (2) welding slag does not qualify as a pollutant under the circumstances of this case and does not trigger any coverage exclusions, and, therefore, **grants** TXI's Motion on this ground; (3) this court lacks factual information to determine whether demister gases qualify as pollutants triggering Evanston's policy exclusions, and, therefore, **denies** TXI's Motion on this ground; and (4) the "business risk" j(5) and (6) exclusions deny coverage for any damages to real property caused by Adkins, but not other property damages beyond the defective work performed by Adkins, and, therefore, to this extent,

**Memorandum Opinion and Order – Page 20**

**grants** TXI's Motion on this ground.  Accordingly, this court **grants in part** TXI's Motion and **denies in part** TXI's Motion to the extent herein set forth.  Evanston has asserted four bases that it believes preclude coverage.  On three of these, the court has ruled against Evanston.  The court, however, because of a fact question, is unable to rule on the issue of the demister gases.  As summary judgment is not appropriate on the issue of whether the demister gases qualify as pollutants, the court cannot make any declaration at this stage whether Evanston has a duty to defend Adkins.

## IV.  CONCLUSION

For the reasons stated herein, a genuine issue of a material fact exists as to whether the demister gases emitted qualify as "pollutants" to trigger either the pollutant exclusion or the welder's endorsement.  Neither Evanston nor TXI has met its burden of showing that no fact question remains on that material issue.  Therefore, this court **denies** Plaintiff's Motion for Summary Judgment.  The court **grants in part and denies in part** as herein set forth Defendants/Counter-Plaintiffs Texas Industries, Inc. and TXI Operations, L.P.'s Motion for Summary Judgment.

**It is so ordered** this 4th day of October, 2006.

Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order – Page 21**